IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WYNN CHRISTENSEN, et al., ) | |
| ) | Civ. No. 05-0080-S-BLW |
| Plaintiffs, ) | |
| ) | MEMORANDUM DECISION |
| v. ) | AND ORDER |
| ) | |
| WILLIAM S. LEMASTER, and ) | |
| SANLECO, INC., ) | |
| ) | |
| Defendants. ) | |

## INTRODUCTION

The Court has before it a motion to amend and a motion to view the crash scene. The Court heard oral argument on February 24, 2006, and the motions are now at issue. For the reasons explained below, the Court will grant the motion to amend and deny the motion to view the scene.

## ANALYSIS

**1.   Punitive Damage Standards**

An award of punitive damages requires a bad act and a bad state of mind. The defendant must (1) act in a manner that was an extreme deviation from

**Memorandum Decision & Order – page 1**

reasonable standards of conduct with an understanding of – or disregard for – its likely consequences, and must (2) act with an extremely harmful state of mind, described variously as with malice, oppression, fraud, gross negligence, wantonness, deliberately, or willfully. *Meyers v. Workmen's Auto Ins.* Co., 95 P.3d 977 (Id. 2004).

At trial, Christensen must satisfy this standard by clear and convincing evidence. *See* Idaho Code § 6-1604(1). For purposes of this motion to amend, however, Christensen does not need to meet this high burden – he need show only "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." *See* Idaho Code § 6-1604(2).

To meet his burden, he has proffered the testimony of Art Atkinson as an expert on the trucking industry. The Court will therefore turn to an analysis of Atkinson's testimony.

## 2.     **Atkinson's Qualifications**

Atkinson has been employed as a safety director for three different companies for nearly ten years. *Id*. at p. 2. He has "received training for and regularly investigated driver accidents on numerous occasions to determine cause and preventability." *Id*. He is currently a licensed commercial motor carrier driver and continues to drive commercial vehicles.

**Memorandum Decision & Order – page 2**

As a result of all these experiences, he is "familiar with the federal motor carrier safety regulations (FMCSR)" and with the "industry standards" and "minimum duties" of motor carriers "with respect to initially qualifying a prospective driver as well as ensuring that an employed driver remains qualified to drive." *Id.* at ¶. 2-3.

3. **Scope of Atkinson's Expertise Under Rule 702**

Atkinson's qualifications render him qualified as an expert under Rule 702 to testify about (1) trucking industry standards, (2) whether Sanleco's conduct complied with those standards, and (3) if not, whether the noncompliance was an extreme deviation from those standards. In other words, his testimony bears on the first of the two elements Christensen must prove under *Meyers*, discussed above.

Atkinson is not an expert in either the law or psychology – and did not personally observe Sanleco's conduct – and thus has nothing to offer on whether Sanleco acted with "extremely harmful state of mind," the second requirement under *Meyers*. Thus, Atkinson cannot testify, as he attempts to do in his Report, that certain conduct of Sanleco was conducted in a manner that was "reckless and wanton." That phrase is a legal term-of-art, the interpretation of which is beyond Atkinson's expertise. The Court will therefore disregard those portions of

**Memorandum Decision & Order – page 3**

Atkinson's report where he attempts to characterize Sanleco's conduct as a violation of certain legal standards.

**4.     Atkinson's Opinions**

Atkinson's basic opinion is that Sanleco "exhibited a grossly substandard . . . attitude toward long-established safety principles and practices designed to ensure the safety of the general motoring public." *See Atkinson Report* at p. 6.  In reaching this conclusion, he details Sanleco's violations of various standards.  The sum total of these violations, Atkinson testifies, conveyed to drivers a "grossly substandard attitude" that safety was not important.

While Atkinson does not use the phrase "extreme deviation," he does use the phrase "grossly substandard," which, in the context of his Report, essentially means the same thing.  Something that is "grossly substandard" not only fails to meet the standard but falls far short of it – in other words, an extreme deviation.  Thus, his failure to use the phrase "extreme deviation" is not fatal.

Moreover, Atkinson uses the phrase "grossly substandard" to describe how far Sanleco strayed from industry standards, a measurement that he has the expertise to make.  This is wholly different from his use of "reckless and wanton," which was an attempt to describe a mental state in legal language, a description that he had no expertise to make.

**Memorandum Decision & Order – page 4**

Atkinson reaches his conclusion for the following reasons: (1) Sanleco should not have hired Lemaster given what Sanleco knew of his past driving problems; (2) Sanleco should have done a more thorough investigation into Lemaster's past that would have revealed even more disqualifying conduct; (3) After hiring Lemaster, Sanleco failed to educate and discipline him; (4) Sanleco let Lemaster drive even though he was not licensed for a time; and (5) The cumulative effect of all these failings by Sanleco was to convey an attitude to Lemaster that safety was not important at Sanleco, and this lax attitude was a proximate cause of the crash.

5.      **Analysis of Atkinson's Opinion**

Atkinson castigates Sanleco for ignoring Lemaster's history. Much of that history consists of inconsequential minor speeding infractions, late deliveries, working over-hours, falsifying a job application, failing to sign logs, and having a bad attitude. This record does not necessarily signal that Lemaster would become a dangerous menace, a rogue driver who would block a highway with his truck at night.

Lemaster's history is not devoid of red-flags, however. For example, at Select (his employer just prior to Sanleco), Lemaster had two accidents, one of them a major rear-end accident. Select deemed both accidents as "preventable" by

**Memorandum Decision & Order – page 5**

Lemaster.  *See Barr Affidavit*, at p. 2, ¶ 3.  Although Lemaster told Bolding something about the rear-end collision, *see Bolding Deposition* at p. 25, Bolding never investigated further by contacting Select.  *Id*. at ¶. 21-22.  If Bolding had called Select, its Administrative Manager, Traci Barr, would have told Bolding (1) about the two preventable accidents Lemaster had while at Select, (2) the "variety of logging and hours of service violations, including a 7-day suspension," and (3) the fact that Select terminated Lemaster.  *See Barr Affidavit* at p. 2, ¶¶ 1-5.  Atkinson concluded that Sanleco's failure to investigate Lemaster's record with Select was an additional reason for finding that Sanleco had a "grossly substandard" commitment to safety.

Atkinson points out that despite Lemaster's numerous driving problems, Sanleco never reprimanded or disciplined him, as dictated by industry standards.  Atkinson concludes that Sanleco never made Lemaster understand that his "poor decision making would no longer be tolerated if he were to remain an employee."  *See Atkinson Report*, at p. 6, ¶ 12.

When he considered Sanleco's failings as a whole, Atkinson concluded that Sanleco's commitment to safety was "grossly substandard," signaling to drivers

**Memorandum Decision & Order – page 6**

that safety was not important. *Id*. at ¶ 16.[1]  While the Court takes issue with parts of Atkinson's analysis, the Court cannot say that it is so implausible that it can be rejected as a matter of law.  Atkinson is an expert on industry standards and can render an opinion on how far Sanleco strayed from those standards.  His Report establishes that Christensen is "reasonably likely" to prove that Sanleco's conduct was an extreme deviation from industry standards.

The second element – the bad state of mind element – requires a showing that Sanleco acted with malice or gross negligence, among other states of mind.  Because there is rarely direct evidence of someone's state of mind, this element is often established by inferences from other evidence.  That "other evidence" here is the evidence just discussed, that Sanleco's conduct was an extreme deviation from industry standards.  If Sanleco officials were deviating from standards to an extreme degree, they may have been acting with gross negligence, a state of mind sufficient to satisfy the second element.  At least, it is "reasonably likely" – the lenient standard governing these proceedings – that jurors could reach that

---

[1] Atkinson was also critical of Sanleco for allowing Lemaster to drive for "a period of time when [he] was not a validly licensed commercial driver . . . ."  *Id.* at p.6, ¶ 15.  It turns out that during his tenure at Sanleco, Lemaster did have a valid commercial license but let his personal driver's license lapse for a nine-month period.  *See Bolding Affidavit* at p. 2, ¶¶ 5-6.  The effect of this is unclear – nothing in the record explains what it means.  While Christensen's counsel filed his affidavit explaining Atkinson's error, *see Chasen Second Affidavit,* Atkinson himself did not supplement his report under Rule 26(e).

**Memorandum Decision & Order – page 7**

conclusion.[2]

This issue is a close one.  Atkinson has a tendency to embroider, to whip up fault from the thinnest of circumstances.  However, there is just enough evidence here to allow the amendment.  At trial, the Court will consider the evidence very carefully to determine if the punitive damage issue should be submitted to the jury.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW Therefore IT IS HEREBY ORDERED, that the motion to amend (docket no. 15) is GRANTED.

IT IS Further ORDERED, that the motion to view scene (docket no. 16) is DENIED.

DATED:  **March 21, 2006**

B. LYNN WINMILL
Chief Judge
United States District Court

---

[2] Obviously, the standard at trial is much more strict; there, Christensen must prove each element by clear and convincing evidence, as discussed above.

**Memorandum Decision & Order – page 8**